# UNITED STATES DISTRICT COURT
## For the DISTRICT OF COLOMBIA

| | |
|---|---|
| ROBERT UTLEY<br>404 Goldridge Dr.<br>Georgetown, TX 78633<br><br>JIM COURT<br>18 Heatherwood Lane<br>Billings, MT 59102<br><br>JEROME A. GREENE<br>12443 W. 68th Ave.<br>Arvada, CO 80004<br><br>EDWIN BEARSS<br>1126 17th St. S<br>Arlington, VA 22202<br><br>PAUL A. HUTTON<br>5009 Justin Drive, NW<br>Albuquerque, NM 87114<br><br>NEIL MANGUM<br>308 John West Road<br>Alpine, TX 79830<br><br>MIKE KOURY<br>218 Alabaster Way<br>Johnstown, CO 80534<br><br>DOUGLAS SCOTT<br>11101 South 98th St.<br>Lincoln, NE 68526<br><br>BILL HARRIS<br>3829 Elijah Baum Rd.<br>Kitty Hawk, NC 27949<br><br>RON NICHOLS<br>3131 Monroe Way<br>Costa Mesa, CA 92626 | **Case No.:**_____ |

| | |
|---|---|
| CUSTER BATTLEFIELD HISTORICAL AND MUSEUM ASSOCIATION PRESIDENT: DENNIS FARIOLI 56 Woodbridge Dr. East Longmeadow, MA 01028 413-525-9292<br><br><br>                     Plaintiffs,<br><br>       v.<br><br>MARY A. BOMAR Director National Park Service 1849 C Street NW Washington, D.C. 20240<br><br>NATIONAL PARK SERVICE, U.S. DEPARTMENT OF INTERIOR 1849 C Street NW Washington, D.C. 20240<br><br>                 Defendants | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.  Plaintiffs in this action seek declaratory and injunctive relief concerning violations of

the National Environmental Policy Act (NEPA), 42 U.S.C. §4321, and the National

Historic Preservation Act (NHPA), 16 U.S.C. § 470, and their implementing regulations,

regarding the issuance of a Finding of No Significant Impact (FONSI)  in an

Environmental Assessment (EA) under NEPA and a finding of no adverse effect on

historical resources under NHPA regarding a proposed expansion of the Visitor Center at

the Little Bighorn Battlefield National Monument in Montana.  Plaintiffs also seek fees

and costs associated with this litigation pursuant to 16 U.S.C. §470w-4 (Section 305 of

NHPA) and 28 U.S.C. §2412(d) (Equal Access to Justice Act).

2.  The Visitor Center is located at the base of Last Stand Hill, site of the climax of the

1876 battle in which General George Armstrong Custer and five companies of the 7th

Cavalry were wiped out.  The Battlefield's General Management Plan (GMP) calls for

the Visitor Center to be relocated away from the historic area.

3.  Plaintiffs in this action are two former Chief Historians of the National Park Service,

two Little Bighorn Battlefield historians, three former Superintendents of the Little

Bighorn Battlefield National Monument, a Distinguished Professor of History, several

authors of historic works concerning the Battlefield and related history, and the Custer

Battlefield Historical & Museum Association.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction under 28 U.S.C. §1331, because this action arises under the

laws of the United States, including the National Environmental Policy Act, 42 U.S.C. §

4321 *et seq.*; the National Historic Preservation Act, 16 U.S.C. § 470, *et seq.*, and the

Administrative Procedure Act 5 U.S.C. §§ 701 -706.

5.  An actual, justiciable controversy now exists between Plaintiffs and the Defendants.

The requested declaratory and injunctive relief is therefore proper under 28 U.S.C. §§

2201-2202 (Declaratory Judgment Act), 5 U.S.C. §§701-706 (APA), and F.R.Civ.P.,

Rule 65 (injunction).

6.  Venue is proper in this Court under 28 U.S.C. §1391(e).  Defendants Mary Bomar and the National Park Service reside in the District of Columbia.

7.  The United States has waived sovereign immunity with respect to the claims raised herein, under 5 U.S.C. §702.  Plaintiffs have exhausted all administrative remedies.

## **PARTIES**

8.  Plaintiff Robert Utley has a long history of involvement with the Little Bighorn Battlefield National Monument and extensive expertise concerning the history of the Little Bighorn and concerning historic preservation in general.  From 1947-1952 he was a seasonal ranger and historian at the Battlefield.  He served as Chief Historian and Assistant Director of the National Park Service from 1964-1976.  He was the Deputy Executive Director of the Advisory Council on Historic Preservation from 1977-1980.  Mr. Utley authored two versions of the Battlefield's official historic handbook in 1969 and 1988.  He is the author of a biography of General Custer and several other books containing chapters about Sioux Indian wars and the Battle of the Little Bighorn.  Since his retirement in 1980, Mr. Utley has been intimately involved with many issues affecting the Battlefield, both in support of and in opposition to Park management.  Mr. Utley believes the existing Visitor Center was built in an intrusive location in 1952 and the present proposal to expand the existing Visitor Center will be even more intrusive on the historical and environmental aspects of the Battlefield.  Mr. Utley professed his opposition by commenting extensively on the Environmental Assessment conducted for the proposed expansion.  Mr. Utley's comments resulted in no change to the text of the EA and were included in the FONSI without attribution to him.

9.  Plaintiff Jim Court was the Superintendent of Little Bighorn Battlefield (then Custer Battlefield) National Monument from 1978-1986 and during this time helped develop the General Management Plan for Little Bighorn Battlefield National Monument which provided for relocating the Visitor Center outside of the key historic areas of the Battlefield.  He has served as treasurer for the Custer Battlefield Preservation Committee from 1982 to the present and is a board member of the Custer Battlefield Historical and Museum Association.  Mr. Court has conducted tours of the battlefield from 1986 until the present and has a continuing familiarity with and interest in the site and its history. Mr. Court never received official notice and was never asked to comment on the proposed expansion of the Visitor Center at Little Bighorn, or the Environmental Assessment of that project, and was not included in the consultation under the National Historic Preservation Act.  He tried repeatedly to contact the Park Superintendent by telephone and e-mail but none of his inquiries were ever acknowledged.

10.  Plaintiff Jerome A. Greene was employed by the National Park Service as a full-time Research Historian from 1973 until his recent retirement in 2007.  He was  previously employed at Little Bighorn Battlefield (then Custer Battlefield) National Monument as a seasonal historian in 1968, 1970, and 1971.  In his capacity as Research Historian, Mr. Greene authored *Stricken Field: The Little Bighorn since 1876,* an administrative history of the Battlefield. Mr. Greene has a genuine love for the Little Bighorn and has extensive knowledge about the environment, culture, and history of the area.  Mr. Greene is one of several experts on the Little Bighorn who were not consulted or notified about the Environmental Assessment  being conducted for the proposed Visitor Center expansion at Little Bighorn; nor was he contacted as a consulting party or otherwise in connection

with the consultation under the National Historic Preservation Act . He would have liked to share his knowledge and comment on the proposed project had he been aware of it.

11. Plaintiff Edwin Bearss was an employee of the National Park Service from 1955 until his retirement in 1995. From 1981 to 1994, he served as Chief Historian for the Park Service. He also served as Park Historian for Vicksburg National Military Park, Regional Research Historian for the Southeast Region, staff historian, research historian, and Special Assistant for Military Affairs to the NPS Director. In his capacity as Chief Historian, Mr. Bearss was responsible for policy, review of compliance documents and liaison with Congress. In the course of these duties, he reviewed planning documents bearing on the Little Bighorn National Battlefield. He also gave speeches at the Little Bighorn Battlefield. Mr. Bearss grew up in the county in which Little Bighorn is located, and has had a life-long interest in the Battlefield. Mr. Bearss never received any official notice of the proposed expansion of the Visitor Center at Little Bighorn, the Environmental Assessment of that project, or the consultation under the National Historic Preservation Act.

12. Plaintiff Paul A. Hutton is currently a Distinguished Professor of History at the University of New Mexico and Executive Director of Western Writers of America. He served as the Executive Director of the Western History Association for 18 years and is the author of *Phil Sheridan's Army*, which includes chapters on Custer and the Little Bighorn. In the 1990s, during another controversy over the Battlefield, Mr. Hutton led an investigative committee of members from the Organization of American Historians which produced a report used to address interpretive programs at the Little Bighorn

Battlefield National Monument. He was a member of the National Park Service Selection

Committee for the Indian Memorial at Little Bighorn and served on the jury that made

the final design selection.  Mr. Hutton has a personal and professional interest in western

American history and would like to be informed of and able to comment on any activity

that may degrade the environmental or cultural values of historic places in the American

West.  Mr. Hutton received no official notice of the proposed expansion of the Visitor

Center at Little Bighorn, the Environmental Assessment of that project or the

consultation under the National Historic Preservation Act.

13.  Plaintiff Ron Nichols is a retired engineer and former president of the Custer

Battlefield Historic and Museum Association.  He has been a member since 1976 and

currently serves on the Board of Directors and as the Association's Treasurer.  Mr.

Nichols has a personal affection for the Little Bighorn and has authored several books

and articles on the Battlefield and its history.  Mr. Nichols requested interested party

status and received a copy of the final EA concerning the Visitor Center expansion from

the NPS.

14.  Plaintiff Neil Mangum has 13 years of professional involvement with the Little

Bighorn Battlefield National Monument.  He served as a historian at Little Bighorn from

1979 to 1988.  He served as the Park's Superintendent from 1998 to 2002.  During his

time as Superintendent, Mr. Mangum was directly involved in efforts to implement the

GMP by relocating the Visitor Center away from the historic battlefield.  These

relocation efforts were thwarted and the Park's GMP has still not been implemented.  Mr.

Mangum knows that the proposed Visitor Center expansion is inconsistent with the GMP

and he firmly believes that the proposal is in violation of the NHPA because it will create an adverse effect on the cultural resources of the Battlefield. Mr. Mangum has a deep personal interest in the Battlefield as both an historian and a former employee. He was not notified of the proposed Visitor Center expansion, the Environmental Assessment being conducted, or the consultation under the National Historic Preservation Act.

15. Plaintiff Michael Koury is a former Chairman of the Board of the Little Big Horn Associates and has been a member of the Custer Battlefield Historical and Museum Association since 1967. As owner of the Old Army Press, Mr. Koury has published over 50 books on General Custer including *Diaries of the Little Big Horn* and *Custer Centennial Observance*, which he authored himself. Mr. Koury has visited the Little Bighorn Battlefield every year on the anniversary of Custer's Last Stand since 1964.

16. Douglas D. Scott, PhD, RPA is a professional archaeologist who worked for the National Park Service for 30 years and recently retired in 2006. Mr. Scott directed the Little Bighorn Battlefield archeological projects from 1984 to 2005. He received the Department of the Interior's Distinguished Service Award for career accomplishments including his innovative approaches to artifact recovery, analysis, and interpretation pioneered at Little Bighorn Battlefield. Mr. Scott has published a number of articles on the archeological investigations at the Park and has authored four books on the subject; *Archaeological Insight to the Custer Battle* (with Richard Fox, 1987, U. of OK Press), *Archaeological Perspectives on the Battle of the Little Bighorn* (with Richard Fox, Melissa Connor, and Dick Harmon, 1989, U of OK Press), *They Died with Custer: Soldiers Bones from the Battle of the Little Bighorn* (with P. Willey and Melissa Connor,

1999, U of OK Press), and *Custer's Heroes: The Medal of Honor at the Little Bighorn* (2007, AST Press, Wake Forest). In his time at Little Bighorn, Mr. Scott acted as the Battlefield's archaeological resource advisor and is intimately acquainted with the issues surrounding the Park, the GMP, and the Visitor Center.

17. Plaintiff Bill Harris served as Superintendent of Little Big Horn Battlefield from 1970-1972 and hosted the first visit of the General Management Plan team. The principal issue of concern at that time was the relocation of the Visitor Center away from the prime historic site. Plaintiff Harris was the first Park Service manager to recommend the change of the Park name from Custer Battlefield to Little Big Horn Battlefield. He transferred to other Park assignments after that first meeting and served as the Superintendent of four other units of the National Park System and as Chief of the Division of Cultural Resources in the Southeast Regional Office. Upon retiring from the National Park Service, Mr. Harris served as Mayor of the Town of Kitty Hawk, NC, for four years. He has maintained an interest in developments and research at the Park. He understands and fully supports the NEPA and NHPA processes and believes that they should be fully applied to this issue.

18. Plaintiff Custer Battlefield Historical & Museum Association (CBHMA) was founded in 1953 by seven people including Major Edward J. Luce, a former Superintendent of the Little Bighorn Battlefield. These people were intimately involved and concerned with the interpretation, preservation and memory of the Battle, both sides involved, the historical period in which the Battle took place, and the Plains Indian Wars in general. The CBHMA now has 1400 members worldwide including historians, history

professors, authors, and other experts on the Little Bighorn. The CBHMA was given a presentation about the proposed Visitor Center by the NPS on June 24, 2005. The CBHMA requested interested party status and received a final copy of the EA from the NPS. Many members of the CBHMA are vehemently opposed to the Visitor Center expansion and member Robert Utley voiced this opposition by commenting extensively during the NEPA process.

19. Defendant Mary Bomar is being sued in her official capacity as Director of the National Park Service.

20. Defendant National Park Service (NPS) is a bureau within the U.S. Department of Interior (DOI). The DOI is department of the Executive Branch of the U.S. Government.

## FACTUAL BACKGROUND

21. The site of Little Bighorn Battlefield National Monument has a long history as a recognized historic site, beginning when it was first designated as a National Cemetery by the Secretary of War in 1879. In 1886 it was proclaimed National Cemetery of Custer's Battlefield Reservation and its purpose expanded to include burials from other campaigns and wars. In 1926 the Reno-Benteen Battlefield was included in the Monument. The Monument was transferred from the War Department to the National Park Service in 1940 and redesignated Custer Battlefield National Monument in 1946. In 1966 the site was added to the National Register of Historic Places. It was renamed Little Bighorn Battlefield National Monument in 1991. Hereinafter, "the Park" shall be used to refer to the Little Bighorn Battlefield National Monument past and present.

22.  The NPS manages all National Parks, many National Monuments, and other properties with various cultural and historical title designations.  The 1916 Organic Act established the NPS with the mission to "promote and regulate the use of … national parks, monuments, and reservations … by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1.

23.  In accordance with NPS policies created pursuant to the 1916 Organic Act, each individual unit within the National Park System must create a General Management Plan (GMP) which "is a broad umbrella document that sets forth long-term goals….and clearly defines the desired natural and cultural resource conditions to be achieved and maintained over time….and identifies the kinds and levels of management activities, visitor use, and development that are appropriate for  maintaining the desired conditions."  National Park Service Management Policies 2006 § 2.2.

24.  The GMP adopted by the Park in 1986 and revised in 1995 specifically states that one goal of the Park is to relocate the existing Visitor Center so that it no longer intrudes visually on the historical and cultural landscape of the Park.

25.  Since 1986 there have been many attempts to implement the GMP with regards to relocating the Visitor Center away from the Little Bighorn Battlefield.  Former Superintendents of the Park including a Plaintiff in this case were given over one-hundred thousand dollars just to look for areas that could be used for relocating the

Visitor Center. Park management consulted with the GSA about acquiring or leasing land near the Park that could be used for a new Visitor Center and found two parcels of land that were suitable. One of these parcels was chosen, and in 2001 Park management went so far as to meet with the GSA and an architectural engineering firm to develop a new Visitor Center design and lease cost agreement. According to the EA, the Park's operations funds could not cover the price of the lease agreement so this action was not further pursued. One private organization offered to donate to the Park a new Visitor Center and additional museum collections pertaining to the Battle of the Little Bighorn. Another private entity offered to donate 15 million dollars and land upon which to build a new Visitor Center. The reason given for dismissing these alternatives in the EA was that these donation offers purportedly were not formally made. The NPS stated "it is difficult to evaluate a proposal that has not been clearly defined." The fact that it is difficult to evaluate a proposal that has not been clearly defined is a main basis for Plaintiffs' claim that the FONSI issued by the NPS was based on an inadequate EA.

26. In consultations with the Montana State Historic Preservation Office pursuant to the NHPA, the NPS originally found that the Visitor Center expansion would have an adverse effect on historic properties pursuant to 36 CFR 800.5. At that time, the Advisory Council on Historic Preservation determined to participate in the resolution of adverse effects and the development of a Memorandum of Understanding due to the potential to impact important historic properties and present issues of concern to Indian tribes.

27.  Later, the NPS changed its determination to "no adverse effect" on historic properties.

28.  NPS was directed by the Advisory Council on Historic Preservation to notify all consulting parties and provide them with the documentation specified in 36 CFR 800.11(e) with regard to the new "no adverse effect" finding.

29.  NPS did not identify Plaintiffs or other interested parties as consulting parties under NHPA procedures, and did not provide them the documentation specified in 36 CFR 800.11(e) concerning its determination of "no adverse effect."  Such documentation is required by regulation to include, among other things, a description of the undertaking and its area of potential effects, including photographs, maps and drawings, as necessary; a description of the undertaking's effects on historic properties; and an explanation of why the criteria for adverse effect were found applicable or inapplicable, including any future actions to avoid, minimize or mitigate adverse effects; and copies of any views provided by consulting parties and the public.

30.  In June of 2006, the NPS released an EA conducted for its proposal to expand the existing Visitor Center at the Park.

31.  The EA selected the proposed expansion of the Visitor Center as the "environmentally preferred" alternative over a no-action alternative, and an alternative involving long-term implementation of the GMP by constructing a new visitor center outside of the historic area.

32.  The EA claimed that its analysis of effects on historic and cultural resources and the submission of the EA to the State Historic Preservation Officer for comment fulfilled the Park's consultation obligations under §106 of NHPA.

33.  The EA found that there would be "no adverse effect" pursuant to NHPA, despite its finding that the "project would increase the development footprint in the core area of the Custer Battlefield Historic District cultural landscape and would increase the overall mass and visibility of the visitor center/museum structure . . . ".(EA, 47)

34.  Plaintiff Robert Utley submitted extensive comments in opposition to the proposal on both the scoping documents leading up to the EA and on the EA itself.  These comments resulted in no changes to the EA or the subsequent FONSI.

35.  On April 21, 2008 Intermountain Region Director Michael Snyder approved a FONSI (Finding of No Significant Impact) based on the 2006 EA.

36.  In May 2008 the Coalition of National Park Service Retirees (CNPSR) and Public Employees for Environmental Responsibility (PEER) sent letters to NPS Director Mary A. Bomar informing her of concerns that the EA was inadequate under NEPA and NHPA to support the FONSI issued and that the proposal as a whole was inconsistent with current NPS policies.

37.  On July 17, 2008, PEER received two responses to its May 2008 letter to Mary A. Bomar.  These two responses were a letter from NPS Deputy Director of Operations Daniel N. Wenk, dated July 15, 2008, and a letter from NPS Intermountain Regional Director Michael D. Snyder, dated July 14, 2008.  These letters stated that all actions to

remodel the existing Visitor Center at Little Bighorn had been put on hold pending

further reconsideration, but did not indicate that the EA and the FONSI under NEPA or

the determination of no adverse impact on historic properties under NHPA had been

withdrawn.


## PLAINTIFFS' CLAIMS

**COUNT 1: Defendant violated NEPA by issuing a FONSI based on an inadequate EA.**

38. Plaintiffs incorporate preceding paragraphs 1-37 herein by reference.

39. The Administrative Procedure Act (APA) provides federal judicial review for any

person "suffering legal wrong because of agency action, or adversely affected or

aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

40. The APA directs reviewing courts to "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law" or "without observance of procedure required by

law." 5 U.S.C. § 706(2).

41. Violations of NEPA, 42 U.S.C. § 4331 *et seq*., are subject to judicial review under

the APA.

42. Plaintiffs are adversely affected by Defendants' failure to comply with the

requirements of NEPA.

43. The Environmental Assessment (EA) and resulting Finding of No Significant Impact

(FONSI) issued by NPS for the Visitor Center expansion are arbitrary and capricious

because the NPS did not take the required "hard look" required by NEPA, and specifically failed to adequately consider factors mandated by NEPA and its implementing regulations before making a determination of no significant impact.

44.  NEPA requires the preparation of an Environmental Impact Statement (EIS) for major federal actions significantly affecting the quality of the human environment.  42 U.S.C. § 4332(C).

45.  The regulations of the Council on Environmental Quality implementing NEPA provide that in determining whether to prepare an EIS, unless the proposed action is subject to a categorical exclusion from NEPA, the federal agency shall prepare an EA. Based on the EA, the agency is to make its determination whether to prepare an EIS.  If the agency determines on the basis of the EA not to prepare an EIS, it is to prepare a finding of no significant impact .  (FONSI).  40 C.F. R. § 1501.4

46.  The purpose of an EA is to "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).

47.  One of the purposes of NEPA is to "preserve important historic, cultural, and natural aspects of our national heritage . . . "  42 U.S.C. § 4331(b)(4).

48.  In determining whether an action will "significantly" affect the human environment, therefore requiring preparation of an EIS, the agency is to consider, among other things, "unique characteristics of the geographic area such as proximity to historic or cultural resources" and "the degree to which the action may adversely affect districts, sites,

highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places . . ."   40 C.F.R. § 1508.27(b)(3) and (8).

49.  The EA and resulting FONSI failed to adequately consider and take into account the impact of the proposed Visitor Center expansion on the historic district of the Little Bighorn Battlefield and of Last Stand Hill in particular, sites which are on the National Register of Historic Places.

50.  In determining whether to prepare an EIS, the agency is also to consider "the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration."   40 C.F.R. § 1508.27(b)(6).  The EA and resulting FONSI failed to adequately consider and take into account the degree to which substantial investment in the expansion of the existing Visitor Center would affect future implementation of the goal of the Park's GMP to resolve the existing adverse effect on the historic site by moving the Visitor Center away from the historic district.

51.  Under NEPA, in an EA, an agency must "study, develop, and describe appropriate alternatives to recommended courses of action."   42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b).  The EA and resulting FONSI failed to adequately develop and describe legitimate alternatives or combinations of alternatives that would meet the current goals for the Visitor Center expansion as well as implement the goals of the GMP developed for the Park over two decades ago.

52.  In evaluating the significance of the environmental impact of a proposed project, and therefore whether an EIS is required, an agency must consider "the degree to which the possible effects on the human environment are likely to be highly controversial."  40 C.F.R. § 1508.27(b)(4). The EA and resulting FONSI are arbitrary and capricious because they did not take public comment and controversy seriously.  There is significant public controversy about and opposition to the Visitor Center expansion as evidenced by communications from former NPS chief historians, archaeologists, and Park Superintendents along with other experts and many members of the public, and by media coverage of the controversy.

53.  Extreme weather phenomena, background noises from visitor's conversations, loud vehicular traffic, and associated air and noise pollution were all listed as "needs" in the EA for the proposed Visitor Center expansion project.  EA p. 2.  However, "Air Quality" and "Soundscapes" are also listed as "Impact Topics Dismissed from Detailed Analysis." EA p. 14-15.  Dismissing from detailed analysis two of the needs for a proposed project does not constitute a "hard look".

54.  The EA and resulting FONSI were arbitrary and capricious because the EA inadequately describes the plans for and the impacts of the proposed Visitor Center expansion and contains contradictory statements as to the scope of the project. The EA states that the NPS proposes to remove a portion of the existing Visitor Center and create a multi-purpose room on top of the same footprint.  EA p. i.  The EA contradicts itself by later stating that the proposed multi-purpose room to be created will take up a larger footprint and even "double the footprint" of the existing Visitor Center.  EA p. 4.  The

EA offers only a few confusing and speculative sentences about what the proposed expansion will actually entail, and no maps or drawings illustrating the proposal. An accurate impact determination cannot be issued for a proposal whose cost, design, size, and thus impact, have yet to be determined.

**COUNT 2**:  **Violation of National Historic Preservation Act Section 106 Consultation Requirements**

55.  Plaintiffs incorporate the preceding paragraphs 1 - 37 herein by reference.

56.  The National Historic Preservation Act (NHPA), Sec. 305, 16 U.S.C. § 470w-4, provides for civil actions in any United States District Court by any interested person to enforce the provisions of the Act.

57. NHPA, Section 106, 16 U.S.C. § 470f, requires that prior to the approval of the expenditure of any federal funds on any federal undertaking, federal agencies must take into account the effect of the undertaking on historic sites and afford the Advisory Council on Historic Preservation established under the Act a reasonable opportunity to comment with regard to such undertakings.

58.  NHPA Section 106 has been implemented through regulations promulgated by the Advisory Council on Historic Preservation, found at 36 C.F.R. Part 800.  The regulations set out a process for consultation among the agency official and other parties with interests in the effects of the undertaking on historic properties.  36 C.F.R. § 800.1(a).

59.  The Section 106 process is to be initiated "early in the undertaking's planning so that a broad range of alternatives may be considered . . . "  36 C.F.R. §800.1(c).  The agency

official is to consult with the state historic preservation officer (SHPO) or tribal historic

preservation officer (THPO), other interested tribal organizations, representatives of local

government, private participants in the proposed project, 36 C.F.R. § 800.2(c), and

"individuals and organizations with a demonstrated interest in the undertaking." 36

C.F.R. § 800.2(c)(5). In addition, the agency official is to provide notice and information

to the public and seek public comment and input. 36 C.F.R. § 800.2(d)(1) and (2).

60. The agency official, in consultation with the SHPO or THPO, is required to identify

parties entitled to be consulting parties and invite them to participate in the Section 106

process. 36 C.F.R. § 800.3(f). The agency is to seek information from consulting parties

and other individuals and organizations likely to have knowledge of or concerns with the

historic properties affected to identify issues related to the undertaking's potential effects

on historic properties. 36 C.F.R. § 800.4(a)(3).

61. In making a determination as to whether the undertaking will have adverse effects on

historic properties, the agency official is to consider the views of consulting parties and

the public. 36 C.F.R. § 800.5(a).

62. The determination as to whether there are "adverse effects" on historic properties is

crucial to the remainder of the process. If there is a documented finding of "no adverse

effect," the agency may proceed with the project and its responsibilities under Section

106 are complete. 36 C.F.R. § 800.5(d)(1).

63. A determination of "adverse effects" results in requirements for further consultation

to resolve the adverse effects. 36 C.F.R. § 800.5(d)(2). The agency is to consult with

the consulting parties to develop and evaluate alternatives or modifications to the project that could avoid, minimize, or mitigate adverse effects on historic properties.  36 C.F.R. § 800.6(a).  The Advisory Council on Historic Preservation may be asked to participate in the consultation by the agency official or any consulting party.  36 C.F.R. § 800.6(a)(1)(i) and (ii).  The public is to be notified and invited to express their views on resolving the adverse effects of the undertaking.  36 C.F.R. § 800.6(a)(4).  The agency may enter into a Memorandum of Agreement with the SHPO or THPO as to how to resolve the adverse effects, which is to be submitted to the Advisory Council on Historic Preservation.  36 C.F.R. § 800.6(b).  If agreement cannot be reached, the Advisory Council on Historic Preservation provides an opportunity for the agency official, all consulting parties and the public to provide their views.  The Council then provides comments, which the head of the agency must take into account in reaching a final decision on the project.  36 U.S.C. § 800.7.

64.  If the agency official proposes a finding of no adverse effect, the agency official is to notify all consulting parties of the finding, 36 C.F.R. § 800.5(c), and provide them with documentation including, among other things, a description of the undertaking, including photographs, maps and drawings as necessary; a description of the undertaking's effects on historic properties; an explanation of why the criteria of adverse effect were found applicable or inapplicable, and copies or summaries of views provided by consulting parties and the public.  36 C.F.R. § 800.11(e).

65.  Consulting parties have the opportunity to file a written disagreement with a finding of no adverse effect.  In that event, the agency official is required to either consult with

the party to resolve the disagreement or request the Advisory Council on Historic Preservation to review the finding.  The agency official is also required to notify all consulting parties that such a submission has been made and make the submission documentation available to the public.  36 C.F.R. § 800.5(c)(2).

66.  An agency may use the NEPA process to meet NHPA Section 106 requirements if the agency official has notified in advance the SHPO/THPO and the Advisory Council on Historic Preservation that it intends to do so. 36 C.F.R. §800.8(c).  The other requirements of the NHPA regulations must also be met within the NEPA process, such as identification of consulting parties in accordance with § 800.3(f) and the identification of historic properties and assessment of adverse effects consistent with the standards and criteria in §§ 800.4 and 800.5.  36 C.F.R. §800.8(c)(1) (i) and (ii). Consultation with consulting parties is required during  NEPA scoping, environmental analysis and the preparation of NEPA documents, and alternatives and proposed mitigation measures are to be developed in consultation with consulting parties and identified in the EA or Draft EIS.  36 C.F.R. § 800.8( c)(1)(iii) and (iv).

67.  With regard to public involvement, the agency may use the agency's procedures for public involvement under NEPA in lieu of public involvement as provided for the NHPA Section 106 process only if "they provide adequate opportunities for public involvement consistent with this subpart."  36 C.F.R. § 800.2(d)(3).

68.  If the NEPA process is used to meet Section 106 requirements, consulting parties have the opportunity to object to the agency official that preparation of NEPA documents has not complied with the standards set forth in the NHPA regulations, or that the

substantive resolution of the effects on historic properties proposed in environmental documents is inadequate.  36 C.F.R. § 800.8 (c)(2)(ii).  Such objections are to be referred to the Advisory Council on Historic Preservation, which may provide an opinion on the objection, which the agency is to take into account in reaching a final decision on the issue of the objection.  36 C.F.R. § 800.8(c)(3).

69.  NPS failed to comply with the regulations implementing Section 106 of the NHPA in its decision-making concerning the proposed expansion of the Little Bighorn Visitor Center. NPS failed to identify consulting parties "with a demonstrated interest in the undertaking" such as the Plaintiffs.  In fact, only the State Historic Preservation Officer and later the Tribal Historic Preservation Officer were included as consulting parties, and they were presented with only one possible alternative, the proposed Visitor Center expansion, and asked to approve it. Thus, they were not involved "early in the undertaking's planning so that a broad range of alternatives may be considered . . . ".  36 C.F.R. §800.1( c).

70.  A few others, such as Plaintiff Utley and Plaintiff CBHMA were given notice of the environmental assessment process, and the opportunity to comment on the EA, but were not accorded the role or the rights of NHPA consulting parties pursuant to the regulations.

71.  As a result of not being accorded consulting party status, Plaintiffs were not afforded the opportunity provided in the regulations to be involved and provide information and identify issues early in the process when a wide range of alternatives was being considered.  36 C.F.R. § 800.1(c); 36 C.F.R. § 800.4(a)(3).

72. As a result of not being accorded consulting party status, Plaintiffs were not afforded the opportunity provided in the regulations to have their views considered when the agency made its determination as to whether the undertaking would have adverse effects on historic properties. 36 C.F.R. § 800.5(a).

73. As a result of not being accorded consulting party status, Plaintiffs were not afforded the opportunity provided in the regulations to be notified of the agency's finding of no adverse effect, 36 C.F.R. § 800.5(c), and to be provided with the documentation required by 36 C.F.R. § 800.11(e).

74. As a result of not being accorded consulting party status, Plaintiffs were not afforded the opportunity provided in the regulations to file a written disagreement with the finding of no adverse effect, and to have the agency official either consult with them to resolve the disagreement or request the Advisory Council on Historic Preservation to review the finding. 36 C.F.R. § 800.5(c)(2).

75. As a result of not being accorded consulting party status, Plaintiffs were not afforded the opportunity provided in the regulations to have their written disagreement supplied to all other consulting parties and the public. 36 C.F.R. § 800.5(c)(2).

76. The EA for the proposed Visitor Center expansion did not fulfill NPS's obligations under NHPA Section 106 as claimed. NPS did not identify consulting parties in accordance with § 800.3(f). NPS did not consult with consulting parties (because none other than the SHPO and THPO were identified) during NEPA scoping, environmental analysis and the preparation of NEPA documents. NPS did not develop alternatives and

proposed mitigation measures in consultation with consulting parties. 36 C.F.R. §

800.8(c)(1)(iii) and (iv).

77.  NPS did not afford consulting parties (because none other than the SHPO and THPO

were identified) the opportunity provided in the regulations to object to the agency

official that preparation of NEPA documents did not comply with the standards set forth

in the NHPA regulations, or that the substantive resolution of the effects on historic

properties proposed in environmental documents was inadequate.  36 C.F.R. § 800.8

(c)(2)(ii).

**COUNT 3:  Violation of the Administrative Procedure Act:  NPS's Finding of No Adverse Effect on Historic Properties Was Arbitrary and Capricious, an Abuse of Discretion and Was Reached Without Observance of Procedure Required by Law**

78.  Plaintiffs incorporate the preceding paragraphs 1 - 37 and 55-77 herein by reference.

79.  The Administrative Procedure Act (APA), 5 U.S.C. § 706(2), directs reviewing

courts to "hold unlawful and set aside agency action, findings, and conclusions found to

be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law" or "without observance of procedure required by law."

80.  As detailed in Count II, NPS's finding of no adverse effects on historical resources

was made without observance of procedures required by regulations promulgated to

implement the consultation requirements of Section 106 of the NHPA.

81.  In addition, NPS's finding of no adverse effect -- which resulted in the project being

able to go forward without further consultation and evaluation of alternatives or

modifications to the project that could avoid, minimize, or mitigate adverse effects on

historic properties -- was arbitrary, capricious and an abuse of discretion, for the following reasons.

82.  NPS never gave any explanation as to why it changed its finding that there was an adverse effect on historic properties to a finding that there was no adverse effect on historic properties.

83.  NPS found in the EA that the "project would increase the development footprint in the core area of the Custer Battlefield Historic District cultural landscape and would increase the overall mass and visibility of the visitor center/museum structure . . . " EA p. 47, 48.  It concluded that this impact would be an "adverse local long term moderate impact on the cultural resources."  EA p. 47.  Yet, the EA concluded that the project would have "*no adverse impact* on monument landscape resources."   EA p. 48.

84.  NPS appears to assert that a moderate adverse effect is "no adverse effect" pursuant to Section 106 as long as the site's eligibility for the National Register eligibility is not jeopardized.  EA p. 45-46.  The regulatory definition of "adverse effects," however, is an alteration of any characteristic of a historic property that qualifies the property for inclusion in the National Register that would "diminish the integrity of the property's location, design, setting, materials or workmanship, feeling or association."  36 C.F.R. § 800.5(a)(1).  Examples of adverse effects include "Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features."  36 C.F.R. § 800.5(a)(2)(v).  There is no requirement that an "adverse effect" be severe enough to jeopardize the site's eligibility for the National Register.  Elsewhere in the EA, NPS admits that "A determination of *no adverse effect* means there is an

effect, but the effect would not diminish in any way the characteristics of the cultural resource that qualify it for inclusion on the National Register." EA p. 35 (underscore supplied).

85. The explanation for the EA's finding of no adverse effect, despite the intrusion on a central historic feature of the Park, is that the increase in the overall mass and visibility of the Visitor Center would be "mitigated to a certain degree by the fact that the outside of the new visitor center multi-purpose room would be glass, and so diminish the feeling of the building's mass, and the fact that the commemoration/interpretation, especially within this core area of the monument, is a historic and contributing use." EA p. 48. Yet, the EA admits that while mitigation is relevant under NEPA, under Section 106, mitigation of adverse impacts does not affect their classification as "adverse." EA p. 35.

86. The EA claims that "there would be no impairment of park values or resources related to cultural landscape resources," EA p. 48, despite the fact that the expanded Visitor Center would intrude upon a central feature of the historic landscape, and is contrary to the GMP for the Park which provides for moving the Visitor Center away from the historic district entirely.

PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court grant the following relief:

87. Issue a declaratory judgment that the NPS violated the NEPA by failing to prepare an EIS and issuing a FONSI based on an inadequate EA.

88.  Issue a declaratory judgment that the NPS violated section 106 of the NHPA, 16 U.S.C. § 470f, by failing to adhere to the requirements of the NHPA implementing regulations.

89.  Issue a declaratory judgment that the NPS Finding of No Adverse Effect on Historic Properties under NHPA was arbitrary and capricious and reached without proper observance of procedure required by law.

90.  Issue an injunction prohibiting the NPS from proceeding in any manner to implement its proposal to expand the existing Visitor Center at the Park until the NPS satisfactorily fulfills its statutory obligations under the NEPA, the NHPA, and the APA.

91.  Award Plaintiffs their reasonable litigation expenses, including attorney's fees, court costs, and other expenses necessary for the preparation and litigation of this case, under the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.* and the National Historic Preservation Act, 16 U.S.C. §470w-4.

92.  Award such additional relief as the Court may deem just and proper.

Respectfully submitted this 31st day of July, 2008

<u>/s/ Paula Dinerstein</u>

Paula  Dinerstein
D.C. Bar No. 333971
Senior Counsel
Public Employees for Environmental
Responsibility (PEER)
2000 P St., N.W. Suite 240
Washington, D.C. 20036
Ph:  202-265-7337
Fax: 202-265-3295
pdinerstein@peer.org

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Robert Utley, Jerome A. Greene, Paul A. Hutton, Edwin Bearss, Jim Court, Neil D. Mangum, Ron Nichols, Mike Koury, Douglas Scott, Bill Harris, Custer Battlefield Historical and Museum Association | Mary A. Bomar and National Park Service |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF        88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Paula Dinerstein
Public Employees for Environmental Responsibility
2000 P Street NW, Suite 240
Washington, DC 20036

ATTORNEYS (IF KNOWN)

---

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ◉ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**◉ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☒ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**○ E. General Civil (Other)          OR          ○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Violation of NEPA, 42 U.S.C. § 4321 et seq.; NHPA, 16 U.S.C. § 470, et seq.; APA 5 U.S.C. § 701 -706.

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐ | DEMAND $ 0 | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND: | YES ☐   NO ☒ |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  7-31-08   SIGNATURE OF ATTORNEY OF RECORD  *Paula Dinerstein*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.